```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Notice of Deposition
10-CV-5596(ADS)(ETB)
```
------------------------------------------x

NICHOLAS BERNHARD, RALPH NATALE, KIRK
CONAWAY and ROY KOHN, as TRUSTEES OF THE
HEALTH FUND 917 AND THE LOCAL 917
PENSION FUND; HEALTH FUND 917 AND THE
LOCAL 917 PENSION FUND,

      Plaintiffs,

 - against -

CENTRAL PARKING SYSTEM OF NEW YORK INC.,
and JOHN DOE,

      Defendants.

------------------------------------------x

    360 West 31st Street
    New York, New York

    October 28, 2011
    11:10 a.m.

 EXAMINATION BEFORE TRIAL of CENTRAL PARKING SYSTEM OF NEW YORK INC., BY SONYA MITCHELL, one of the Defendants herein, taken by the Plaintiffs, held at the above-mentioned time and place before Anthony Giarro, a Notary Public of the State of New York.

Page 38

SONYA MITCHELL

2 A We may have some managers
3 that we have made contributions for.
4 They're really not managers. They're
5 foremen.
6 Q What are their job titles?
7 A Foremen.
8 Q Has Central Parking made any
9 contributions for people who are
10 employees whose job titles are manager?
11 A No.
12 Q Has Central Parking made any
13 contributions for any employee whose job
14 title is assistant manager?
15 A Not assistant manager in my
16 system, no. They would also be listed
17 as -- some would also be listed as
18 foremen.
19 Q Why would an assistant
20 manager be also listed as a foreman?
21 A My system says foreman, but
22 some of them may be called an assistant
23 manager.
24 Q Where would they be called
25 an assistant manager?

Page 39

SONYA MITCHELL

2 A Just among themselves or
3 within the field, in operations.
4 Q There were documents given
5 to the auditors in order to perform this
6 audit; that's correct, yes?
7 A Yes.
8 Q Did any of those documents
9 do note employees as being managers?
10 A Yes. They asked for a list
11 of managers.
12 Q Were there any payroll or
13 database documents that identified any of
14 these employees as being managers?
15 A No.
16 Q Were there any documents
17 given to the auditors while they were
18 performing their audit that identified
19 employees as foremen?
20 A Possibly.
21 Q Were there any documents
22 given to the auditors during the audit
23 that identified employees as supervisors?
24 A Possibly.
25 Q You had said before that

Page 40

SONYA MITCHELL

2 there were people who might be called
3 assistant managers and yet they were
4 foremen?
5 A Yes.
6 Q Would documents provided to
7 the auditors have identified them as
8 assistant managers?
9 A Possibly.
10 Q What documents would
11 identify them as foremen, not assistant
12 managers?
13 A Our computer-generated
14 documents would identify them as foremen
15 because that's what they are in the
16 system.
17 Q Are foremen covered by the
18 collective bargaining agreement?
19 A Yes.
20 Q Are assistant managers
21 covered by the collective bargaining
22 agreement?
23 A No.
24 Q If you have a document that
25 identifies them as foremen and assistant

Page 41

SONYA MITCHELL

2 managers, how would you differentiate
3 whether they were covered by the
4 collective bargaining agreement?
5 A Whatever is in our system.
6 Q Your system is a
7 computerized system?
8 A Yes, it is.
9 Q Were printouts from the
10 computerized system ever provided to the
11 auditors?
12 A I'm sure there were, yes.
13 Original data came from our system.
14 Q If I'm recalling correctly,
15 you said that Central Parking has paid no
16 contributions for anybody who's a
17 manager?
18 A Anybody who was excluded
19 from the collective bargaining agreement.
20 Q That's not my question. Has
21 Central Parking made any contributions
22 for anybody for whom documentation
23 identified them as a manager?
24 A Not to my knowledge.
25 Q Did anyone else at Central

11 (Pages 38 - 41)

Page 42

```
 1              SONYA MITCHELL
 2  Parking review the findings?
 3     A     No.
 4     Q     Did you discuss the findings
 5  with anybody else?
 6     A     Yes.
 7           MR. ROWE: Which findings?
 8  You're talking about the auditor's
 9  findings?
10           MS. BRUNO: The auditor's
11  findings.
12     Q     By findings, I mean the
13  auditor's reports that were sent to you
14  as a determination of what amounts the
15  funds believed were due.
16     A     Okay.
17     Q     The term of art I'm going to
18  use is findings. Did you discuss the
19  findings with anybody else at Central
20  Parking with the exception of your
21  attorney?
22     A     Yes.
23     Q     Who did you speak with?
24     A     I've spoken with my human
25  resources manager. I've spoken with my
```

Page 43

```
 1              SONYA MITCHELL
 2  then boss, who was Pete Buscher.
 3     Q     Anyone else?
 4     A     I believe that's it, and my
 5  attorney, the attorney in our corporate
 6  office as well.
 7     Q     Who was the attorney in the
 8  corporate office?
 9     A     Chris Katl.
10           MS. BRUNO: Is he co-counsel
11  with you?
12           MR. ROWE: No.
13     Q     When did you speak with
14  Mr. Buscher?
15     A     I've probably had several
16  conversations with him about the audit,
17  probably initially when they first came
18  in. And he also knows what the
19  findings -- or knew -- he's no longer
20  employed -- what the findings were and
21  what my response were to those findings.
22     Q     Did you tell Mr. Buscher
23  that you believed some of the findings
24  were not accurate?
25     A     Absolutely.
```

Page 44

```
 1              SONYA MITCHELL
 2     Q     Did he look at the findings?
 3     A     Yeah. I gave him a copy. I
 4  would think he did.
 5     Q     Did he express to you any
 6  direction on what you should do?
 7     A     No, he didn't.
 8     Q     Did he express to you any
 9  opinion as to the validity of the
10  findings?
11     A     No, he didn't.
12     Q     Who was the human resources
13  manager you spoke with?
14     A     Edy Albizu.
15     Q     When did you speak with her?
16     A     I don't know what the date
17  is. I don't know what date. I think we
18  may have had a couple of conversations as
19  well.
20     Q     What was the sum and
21  substance of those conversations?
22     A     Probably just talking about
23  any pending audits we had, where we stood
24  on them.
25     Q     Did you have any discussions
```

Page 45

```
 1              SONYA MITCHELL
 2  with her on this specific audit, the 2004
 3  New York?
 4     A     Yes.
 5     Q     What was the sum and
 6  substance of discussions strictly on that
 7  audit?
 8     A     I can't say verbatim what it
 9  was, probably it was either the earlier
10  part of the year or last year sometime.
11     Q     What was the sum and
12  substance? What did you discuss?
13     A     Specifically the audit
14  findings here.
15     Q     Did she review the findings?
16     A     No, she didn't.
17     Q     Did you express to her that
18  you believed that not all the findings
19  were valid?
20     A     That I believed they were
21  valid?
22     Q     That not all of them were
23  valid.
24     A     Yes.
25     Q     Did she give you any
```

12 (Pages 42 - 45)

Page 46

SONYA MITCHELL

2 direction or anything like that?
3   A   No.
4   Q   Did she express any opinion
5 regarding that?
6   A   No.
7   Q   So this was just an
8 informative, hey, I looked at the
9 findings and I don't think they all need
10 to be paid?
11   A   Something of the sort.
12   Q   Why did you speak with
13 Mr. Katl?
14   A   Because he knows of any
15 legal issues that we have within the
16 city. He's our corporate counsel.
17   Q   Did you speak with him just
18 to tell him this was there or did you
19 actually discuss the findings with him?
20   A   No.
21        MR. ROWE: Objection.
22        MS. BRUNO: On the grounds
23 of?
24        MR. ROWE: Attorney-client
25 privilege.

Page 47

SONYA MITCHELL

1
2        MS. BRUNO: He's not
3 representing her or Central.
4        MR. ROWE: I'm going to
5 object. Don't ask the question.
6   Q   Is there anyone else that
7 you discussed your review with?
8   A   My staff, the auditors.
9   Q   Is there somebody to whom
10 you're supposed to report or you're
11 supposed to report your analysis of the
12 findings? Is there somebody who expected
13 to hear from you what you thought of the
14 findings that you had to tell that to in
15 the organization?
16   A   No.
17   Q   Has Central Parking paid
18 contributions for any supervisory
19 employees?
20   A   Contributions are paid based
21 upon job code.
22   Q   I'm going to ask you to
23 please answer it with a yes or no. To
24 your knowledge --
25   A   I don't know.

Page 48

SONYA MITCHELL

1
2   Q   Has Central Parking paid any
3 contributions for any area managers?
4   A   Absolutely not.
5   Q   Has Central Parking paid any
6 contributions for any area managers who
7 did not have the authority to hire,
8 promote, discipline or effect changes in
9 an employee's status?
10   A   They don't exist.
11   Q   Why not?
12   A   Because an area manager can
13 effectuate change.
14   Q   What changes can an area
15 manager do?
16   A   They can hire, they can
17 terminate, disciplinary action.
18   Q   Has Central Parking paid any
19 contributions for any supervisors?
20   A   Not to my knowledge.
21   Q   And why not?
22   A   Because the job code
23 supervisor is not included in my data.
24   Q   So there is nobody at
25 Central Parking known as a supervisor?

Page 49

SONYA MITCHELL

1
2   A   We have supervisors.
3   Q   Then what would they be
4 listed in your data as?
5   A   A supervisor. I would hope
6 that they would be listed as a
7 supervisor.
8   Q   But you just said the job
9 supervisor is not in your data, unless I
10 misunderstood you.
11   A   I contribute for attendants,
12 cashiers, foremen.
13   Q   I understand that. So you
14 do not contribute for anyone who is not
15 an attendant, a cashier or a foreman?
16   A   Well, the maintenance
17 contract has maintenance staff; but, no,
18 I don't.
19   Q   So if somebody is not in one
20 of those four job descriptions, you do
21 not contribute for them?
22   A   That's correct.
23   Q   And you have job codes for
24 those four positions?
25   A   Yes, I do.

Page 50

```
1            SONYA MITCHELL
2     Q     Would people in those
3  positions ever have a job code or a job
4  description that lists them as something
5  else?
6     A     It shouldn't.
7     Q     So if there is a job code or
8  a job description listing somebody as a
9  manager or assistant manager, they would
10 not be performing the work of any of
11 those four jobs that you just said you
12 contribute for?
13    A     They shouldn't be, no.
14    Q     I'm just going to go back --
15 and I apologize, I may have asked this
16 already -- you said there were foremen
17 who are also considered managers?
18    A     They may call them -- they
19 may be the lead person. They may call
20 them managers within the facility, within
21 the location.
22    Q     What would their job code
23 indicate?
24    A     A foreman would be a
25 foreman.
```

Page 51

```
1            SONYA MITCHELL
2     Q     The job code would indicate
3  a foreman?
4     A     Yes.
5     Q     Have you determined whether
6  any of the findings are valid, any of the
7  individual findings are valid for any of
8  the employees?
9     A     Yes, there were some
10 findings.
11    Q     Have you told any
12 representative, employee, manager, owner
13 or principal of Central Parking that you
14 determined that certain of the findings
15 are valid?
16    A     I shared that with my
17 manager.
18    Q     Did you discuss with your
19 manager whether to pay that portion of
20 the findings?
21    A     No. The audit was still
22 open.
23    Q     So the manager did not
24 direct you to pay or to not pay that
25 portion of the findings at this time?
```

Page 52

```
1            SONYA MITCHELL
2     A     No.
3     Q     Has Central Parking paid any
4  portion of the findings?
5     A     Not as of yet. It's still
6  open.
7     Q     So does that mean that
8  Central Parking will not pay any portion
9  of the findings until the entirety of the
10 findings have been determined?
11    A     Well, we do audits all the
12 time. And generally what happens is when
13 you respond to the initial, the auditors
14 will review and determine whether or not
15 they agree with our response to the
16 audit, and they will send us a final
17 letter.
18    Q     Is the reason you have not
19 paid is because you have not received a
20 final letter from the auditors?
21    A     Final audit findings letter
22 or communication.
23    Q     Is it your contention that
24 Plaintiffs' Exhibit 2, which are the
25 letters from the fund, saying final
```

Page 53

```
1            SONYA MITCHELL
2  results of the payroll inspection, the
3  findings is not, in fact, the final audit
4  letter that you would need to pay a
5  portion of the findings?
6     A     No, because this is the
7  initial. This is what their findings
8  are, and then I responded to it.
9     Q     So if the auditors sent you
10 a letter tomorrow, saying this is our
11 final findings, that's what you would
12 need in order to pay --
13    A     If I agreed with it, yes.
14    Q     If you didn't agree with the
15 whole thing, then you would pay no
16 portion of it?
17    A     Then I would let them know
18 what I didn't agree to.
19    Q     If you received a final
20 letter and you agreed with a portion of
21 it and disagreed with a portion of it,
22 would you pay the portion that you agreed
23 to, that you agreed with?
24    A     I would usually wait until
25 there is a determination because at some
```

14 (Pages 50 - 53)

Page 54

SONYA MITCHELL

2 point, we're either going to agree --
3 we're going to agree to something at that
4 point.
5   Q   So in other words, if I'm
6 understanding you correctly, if you
7 agreed with some of the findings and
8 disagreed with others, you would not pay
9 the portion with which you agreed until
10 the entire thing was worked out?
11   A   I don't generally do it that
12 way. They have many other audits,
13 further funds that we do, and it's not a
14 practice.
15   Q   Do you have the final
16 authority to determine which findings
17 will and will not be paid?
18   A   Well, it's based upon my
19 response to the audit.
20   Q   Is there anybody from whom
21 you must get approval?
22   A   No.
23   Q   So you can decide, okay,
24 this is payable, this is not, we and the
25 auditors have reached an agreement and on

Page 55

SONYA MITCHELL

2 your say so, that can be paid?
3   A   Yes. I'm accurate or try my
4 best to be accurate in my findings.
5   Q   Does anybody else have the
6 authority to do this, anybody else at
7 Central Parking?
8   A   Yes, certainly.
9   Q   Who else would have that
10 authority?
11   A   My boss would have the
12 authority.
13   Q   Who is your boss?
14   A   Currently, it would be under
15 Hector Chevalier.
16   Q   Have you discussed the
17 findings with him?
18   A   I did initially. I may have
19 had a short conversation with him but
20 nothing -- no.
21   Q   So he's left the discretion
22 to you?
23   A   Yes.
24   Q   Anyone else?
25   A   Just my previous boss.

Page 56

SONYA MITCHELL

2        MS. BRUNO: Can you mark
3   this, please?
4        (The above-referred-to
5   document was marked as Plaintiffs'
6   Exhibit 5 for identification, as of
7   this date.)
8   Q   I'm going to give you
9 Plaintiffs' Exhibit 5, which is
10 Defendants' response to Plaintiffs' first
11 interrogatories and request for
12 production of documents and Defendants'
13 supplemental response to Plaintiffs'
14 first interrogatories for production of
15 documents with a stack of documents. You
16 can open it and take it out of order if
17 you want to look through.
18   A   Okay.
19   Q   Have you seen these
20 documents before?
21   A   Yes.
22   Q   Can you tell me what you
23 believe them to be?
24   A   Well, it appears that these
25 are my responses to the audit findings,

Page 57

SONYA MITCHELL

2 backup.
3   Q   The documents on top of
4 them, which are the Defendants' responses
5 to Plaintiffs' interrogatories, have you
6 seen those before?
7   A   Yes. I believe I have seen
8 this one.
9   Q   The stack of documents that
10 you're holding that you said were your
11 responses were produced in response to
12 Plaintiffs' request for documents. Were
13 you asked to assemble documents in order
14 to respond to those requests?
15   A   To assemble the documents to
16 respond to?
17   Q   Or to provide documents that
18 would respond to the interrogatories.
19   A   I'm sure I was asked to
20 provide some documents. I may have
21 provided more.
22   Q   And these are documents
23 that, to your knowledge, you provided to
24 respond to the requests?
25   A   Yes. They look like my